UNITED STATES of America,
Plaintiff-Appellee,

v.

Sammy Brice BROCK,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Roger Lee BARD, Defendant-Appellant.

Nos. 80–1736, 80–1737.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 9, 1981.

Decided Feb. 18, 1982.

As Amended March 15, 1982.

Rehearing and Rehearing En Banc
Denied June 3, 1982.

See also, 9 Cir., 623 F.2d 551 and 625 F.2d 854.

James S. Coon, Portland, Or., for Brock.

John S. Ransom, Portland, Or., for Bard.

James McLaughlin, Asst. U. S. Atty., Portland, Or., for U. S.

Before ADAMS *, SNEED and FLETCHER, Circuit Judges.

SNEED, Circuit Judge:

Appellants, Brock and Bard, along with codefendants Bernard, Childress, and Cochran, were charged by indictment on May 24, 1978 in the District of Oregon with conspiracy to possess with intent to manufacture and distribute methamphetamine, a controlled substance, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 846 (Count I), manufacture of methamphetamine, in violation of 21 U.S.C. §§ 812 and 841(a)(1) (Count II), and possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 812 and 841(a)(1) (Count III). Brock and Bard were convicted in a jury trial of Counts I and II and acquitted of Count III. Both were sentenced to three year prison terms and five year probation terms to run concurrently with the prison terms.[1] We affirm the convictions.

## I.

## FACTS

The facts relevant to this appeal have been revealed to this court in previous appeals and appear in two previous opinions of this court. *See United States v. Ber-*

---

* Honorable Arlin M. Adams, United States Circuit Judge for the Third Circuit, sitting by designation.

1. This is the second appeal involving these appellants, and the third appeal involving this factual situation. Previously, in a government appeal involving this indictment, this court reversed a suppression order resulting from the district court's finding of no probable cause to arrest and an alleged Jencks Act violation. *See United States v. Bernard,* 607 F.2d 1257 (9th Cir. 1979), *revised,* 623 F.2d 551 (1980) (*Bernard I*). Also, this court reversed Bernard's conviction in the Eastern District of Washington for conspiracy to manufacture metham-

phetamine growing out of the transfer of chemicals from Lewiston, Idaho to Clarkston, Washington, facts also underlying the present appeal. *See United States v. Bernard,* 625 F.2d 854 (9th Cir. 1980) (*Bernard II*).

Count I in this case was subsequently dismissed against Bernard upon his conviction in the Eastern District of Washington. He pleaded guilty to Count II and is awaiting sentencing, at which point Count III will be dismissed. Childress pleaded guilty to Count II and Counts I and III were dismissed. Cochran testified at Brock and Bard's trial in exchange for dismissal of all charges against him.

*nard,* 607 F.2d 1257 (9th Cir. 1979), *revised,* 623 F.2d 551, 553–54 (9th Cir. 1980) (*Bernard I* ); *United States v. Bernard,* 625 F.2d 854, 856 (9th Cir. 1980) (*Bernard II* ). Nonetheless, the interests of convenience and coherence will be served by again setting them forth.

In December 1977 Timothy Boehm of Physicians & Surgeons Supply Co. in Spokane, Washington, received a telephone order from Bernard for phenyl-2-propanone, methylamine, and other chemicals. When placing the order Bernard claimed he was associated with a fertilizer company. Because the chemicals are also precursor chemicals for the manufacture of amphetamines, Boehm contacted the Drug Enforcement Agency (DEA).

Bernard picked up the chemicals on December 22, 1977. DEA agents, under the direction of Michael E. Fredericks, observed the pickup and instituted surveillance of Bernard. Bernard proceeded by car with another passenger through downtown Spokane and out of the city. Bernard took a circuitous route to Ridgefield, Washington and then toward Odessa, Washington. It appeared to Fredericks that the surveillance had been detected. Thereafter, he terminated it.

Bernard again contacted Boehm in January 1978 and placed a second order, this time for nine kilograms of methylamine. When the chemicals arrived in March, Fredericks picked them up and took them to the Spokane office of the DEA where they were placed in a specially prepared canister that was fitted with a false bottom beneath which an electronic transmitter (beeper) had been placed. Bernard subsequently called Boehm and requested that the chemicals be delivered to the Garrett Freight Line Depot in Lewiston, Idaho. Fredericks then took the canister to the Garrett Depot in Lewiston, had the necessary paperwork prepared to conceal the intercession of the DEA, and resumed surveillance.

On March 22, 1978 Bernard and another passenger appeared at the Garrett Depot in the same car that had been used to pick up the first shipment in December 1977. They entered the depot, obtained the canister, and placed it in their car. Fredericks began both visual and electronic surveillance of the vehicle; however, all contact was lost near Clarkston, Washington. Fredericks then proceeded to Walla Walla, Washington, the suspected destination of the canister, and conducted further electronic surveillance, but without success. The beeper was next picked up on the evening of March 23 coming from a home on Tenth Street in Clarkston. The beeper continued transmitting from the Clarkston location until at least through the afternoon of March 24.

When Fredericks next checked for the transmission on March 27, it was no longer at the Clarkston location. The beeper was finally located through aerial surveillance in Meacham, Oregon on March 28. Ground surveillance revealed that the beeper was in a cabin in Meacham. The cabin was known to have been used by Bernard in the past, and it was the residence of appellants Brock and Bard. Electronic surveillance of the Meacham cabin was maintained while Fredericks returned to Spokane to coordinate efforts between the Eastern District of Washington and the District of Oregon to obtain a warrant to search the cabin. On March 31 a search warrant was obtained based on Fredericks' affidavit. However, the warrant was not executed at that time.

Bernard placed a third order with Boehm in early April, this time for phenyl-2-propanone, but later called to say Childress would be picking it up. On April 6 Childress appeared and picked up the order. Bard had accompanied Childress to the pickup by private plane and taxi, and they both returned to the plane with the chemicals and then flew to Hermiston, Oregon.

On April 7 surveillance in Hermiston revealed a meeting of vehicles and a motor home, which then proceeded to Hat Rock State Park, arriving at approximately 1:30 p. m. The convoy parked in a secluded area near a river. Visual surveillance was maintained throughout the afternoon. An agent smelled chemicals "cooking." Another observed Brock dash out of the motor home

gasping for air, as if choking on fumes. Fredericks arrived at 6:50 p. m. and, after talking with the agents on the scene, decided to search the motor home at approximately 7:00 p. m. The agents ordered all of the occupants out of the motor home and placed them under arrest. Brock, Bard, Bernard, Childress, and Cochran were found in the motor home. Agents then entered the motor home to see if any other people were inside, to turn off any cooking apparatus, and to inventory its contents. They found a methamphetamine laboratory behind a drawn curtain at the back of the motor home.

The laboratory was then packed up for transport. The motor home was driven to Hermiston where agents searched it pursuant to a warrant the following day. The search warrant previously obtained for the Meacham cabin was also executed on April 8.

## II.

## ANALYSIS

Appellants raise seven issues on appeal, each of which we will address.

### 1. *Introduction of Coconspirator Statements and Acts*

Appellants first contend that the district court erred by admitting the out-of-court statements and acts of their alleged coconspirator Bernard. They contend that they were prejudiced because, while the statements and activities of Bernard clearly indicated that he was engaged in the manufacture of methamphetamines, there was no evidence linking them to the activities of Bernard other than their occupancy of the Meacham cabin.

■ Statements of a coconspirator made during the course and in furtherance of a conspiracy are not hearsay under the Federal Rules of Evidence and are admissible against another conspirator. Fed.R.Evid. 801(d)(2)(E); *United States v. Fielding*, 645 F.2d 719, 725 (9th Cir. 1981); *United States v. Weiner*, 578 F.2d 757, 768–69 (9th Cir.) (per curiam), *cert. denied*, 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978). A prerequisite to admission under Rule 801(d)(2)(E), however, is that there must be independent proof of the conspiracy and of the defendant's connection to the conspiracy. *United States v. Fielding*, 645 F.2d at 725; *United States v. Weiner*, 578 F.2d at 768–69.

■ Here, there was clearly sufficient independent proof of both the existence of the conspiracy and of the appellants' connection to it. The canister, which was ordered by Bernard and in which the beeper was placed, was tracked to appellants' residence, Bard picked up Bernard's third chemical order, and both appellants were arrested, along with Bernard, in the motor home where the methamphetamine laboratory was in operation. On these facts a rational jury could find that Bernard's *second* and *third* orders, acquisition, and transportation of chemicals were in furtherance of a single conspiracy to manufacture methamphetamine involving both Brock and Bard. Consequently, the evidence was admissible.

■ Appellants' objection to testimony regarding the statements and actions of Bernard with respect to the *first* order of chemicals is more substantial. It is quite arguable that these statements and actions are not within the coconspirator exception of Rule 801(d)(2)(E). Moreover, it could be argued that testimony regarding Bernard's evasive actions designed to shed DEA surveillance is inadmissible because irrelevant.[2] Nonetheless, such possible errors were clearly harmless in light of the overwhelming evidence of guilt. *See id.* at 772; 4 *Weinstein's Evidence*, ¶ 801(d)(2)(E)[01] at 801–183–84 and n.64 (1979). Moreover, it is

---

**2.** The parties address the admissibility of the testimony of Bernard's attempts to evade DEA surveillance as a question of whether such acts were coconspirator statements not within the definition of hearsay under Rule 801(d)(2)(E). Such testimony concerned "nonverbal conduct" and, consequently, is a "statement" within the hearsay rules only "if it [was] intended by him as an assertion." Fed.R.Evid. 801(a)(2). The evasive attempts cannot be said to have been intended as "communicative" acts; instead, they were merely *nonassertive* conduct, which is not hearsay. *See generally* 4 *Weinstein's Evidence*, ¶ 801(a)[01] at 801–53–57 (1979). Thus, it is admissible if relevant.

not likely that the jury's assessment of Brock's and Bard's activities was influenced by evidence that Bernard once attempted to evade DEA agents.

### 2. Variance in Proof of Conspiracy

Appellants' next contend that there was a fatal variance between the evidence adduced at trial and the conspiracy charged in Count I of the indictment. They argue that testimony regarding Bernard's activities revealed at least two distinct conspiracies. The first was composed of Bernard and Ralph Comstock, which involved the second chemical order that was electronically tracked from Lewiston, Idaho to the Meacham cabin and was the subject of the *Bernard II* prosecution. The second involved the third chemical order that ultimately led to the arrests at Hat Rock State Park. The indictment, the appellants assert, charges only the conspiracy relating to the Hat Rock State Park incident. Therefore, they contend that they were prejudiced by the transfer of guilt from the conspiracy not charged to the one that was charged, rely-

ing principally on *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and *United States v. Durades*, 607 F.2d 818 (9th Cir. 1979).

In *Kotteakos* the Solicitor General conceded that the evidence had shown a multiple wheel-type conspiracy with one Brown at the hub, but had not shown that the spokes of the wheel were connected by a rim. 328 U.S. at 756, 66 S.Ct. at 1243. The failure to demonstrate the existence of a rim made obvious the prejudice to the defendant which results from proof of criminal acts committed by those not a party to the defendant's illegal activity. *See also United States v. Durades*, 607 F.2d 818 (proof of multiple conspiracies when single conspiracy charged requires reversal where prejudice is obvious).

Here, however, the existence of the rim was both charged and established. Although the only overt acts alleged in the indictment related to the events of April 7, 1978, the date of the arrests, the conspiracy was alleged to have begun "on or about January 1, 1978." [3] Thus, the second chemi-

---

**3.** The indictment read as follows:

COUNT I

1. From on or about January 1, 1978, and continuing to and including April 7, 1978, in the District of Oregon, and at various places outside the District of Oregon, HOWARD DALE BERNARD, GORDON RAE CHILDRESS, SAMMY BRICE BROCK, ROGER LEE BARD, and RUSSELL RICHARD COCHRAN, defendants herein, did willfully and knowingly combine, conspire, confederate, and agree together and with each other and with diverse other persons, whose names to the Grand Jury are unknown, to manufacture and to possess with intent to distribute a substance which contained methamphetamine, a Schedule II Drug Controlled Substance, in violation of Title 21, United States Code, Sections 812, 841(a)(1), and 846.

2. In furtherance of said conspiracy and to effect the object thereof certain of the defendants did commit, among others, the following overt acts:

OVERT ACTS

1. On or about April 7, 1978, the defendants HOWARD DALE BERNARD, GORDON RAE CHILDRESS, SAMMY BRICE BROCK, ROGER LEE BARD, and RUSSELL RICHARD COCHRAN did meet at a place near Hat Rock State Park in the State of Oregon.

2. On or about April 7, 1978, the defendants HOWARD DALE BERNARD, GORDON

RAE CHILDRESS, SAMMY BRICE BROCK, ROGER LEE BARD, and RUSSELL RICHARD COCHRAN did personally and physically handle portions of an apparatus capable of manufacturing methamphetamine, a Schedule II Drug Controlled Substance.

3. As further overt acts, whose purpose was to effect the object of the above-mentioned conspiracy, the Grand Jury charges and incorporates herein by reference those acts specified in Counts II and III below.

COUNT II

On or about April 7, 1978, in the District of Oregon, HOWARD DALE BERNARD, GORDON RAE CHILDRESS, SAMMY BRICE BROCK, ROGER LEE BARD, and RUSSELL RICHARD COCHRAN, defendants herein, did knowingly and intentionally manufacture a substance that contained methamphetamine, a Schedule II Drug Controlled Substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 812, and Title 18, United States Code, Section 2.

COUNT III

On or about April 7, 1978, in the District of Oregon, HOWARD DALE BERNARD, GORDON RAE CHILDRESS, SAMMY BRICE BROCK, ROGER LEE BARD, and RUSSELL RICHARD COCHRAN, defendants herein, did knowingly and intentionally possess with intent to distribute a substance that contained methamphetamine, a Schedule II Drug Controlled Substance; in violation of Title

cal order was clearly within the scope of the indictment. The fact that potential subgroups existed, *e.g.*, Bernard and Comstock, does not negate the existence of a single conspiracy. *United States v. Zemek*, 634 F.2d 1159, 1167 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). The jury easily could have inferred from the fact that the second order was electronically tracked to the Meacham cabin, appellants' residence, that it was part of a single continuing conspiracy to manufacture methamphetamine that culminated in the arrests on April 7.

Moreover, it was not even a theory of the defense that the proof at trial showed a multiple conspiracy rather than a single conspiracy. Appellants did not ask for a multiple conspiracy instruction. *See United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir. 1981) (defendant entitled to jury instruction on a legitimate theory of defense if there is evidence to support it). Their defense was that they were legitimate fertilizer manufacturers.

### 3. *Failure to Suppress Statements of Cochran*

Appellants next contend that their convictions should be reversed because of the admission of Cochran's testimony. They insist that the district court erred: first, by failing to take Cochran's testimony outside the presence of the jury, as it had agreed to do; second, by failing to exclude Cochran's testimony because it was not in furtherance of the conspiracy; and third, by admitting Cochran's testimony in violation of appellants' Sixth Amendment confrontation rights in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Appellants' arguments are meritless.

■ The record is quite clear that appellants' objections to Cochran's proposed testimony concerned appellants' fear that leading questions would be utilized by the government to elicit his testimony. They were not objecting to the content of the testimony. They did not object to the district court reversing its prior decision to take the testimony preliminarily without the jury present. Also, they failed to object to the admission of Cochran's testimony when it was offered to the jury. Consequently, appellants have waived their objections to the district court's treatment of Cochran's testimony.

Accordingly, we may review appellants' contentions only for plain error. Fed.R. Crim.P. 52(b); *United States v. Ochoa-Torres*, 626 F.2d 689, 692 (9th Cir. 1980). No such error exists. *See, United States v. DeFillipo*, 590 F.2d 1228, 1236–37 (2d Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979); *United States v. Mayes*, 512 F.2d 637, 653 (6th Cir.), *cert. denied*, 422 U.S. 1008, 95 S.Ct. 2629, 45 L.Ed.2d 670 (1975), *overruled on other grounds, United States v. Enright*, 579 F.2d 980 (6th Cir. 1978).

■ Additionally, *Bruton* is inapplicable to this case. *Bruton* is premised on the confrontation clause and bars the introduction of post-arrest statements made by codefendants that implicate other defendants when the *declarant will not testify at trial.* 391 U.S. at 126, 88 S.Ct. at 1622. Here, appellants confronted Cochran. He testified at trial and was cross-examined by them. Appellants, in their assignment of error, complain about being confronted by Cochran, not about being denied confrontation.

### 4. *Warrantless Search of Motor Home*

Appellants next attack the warrantless search of the motor home at Hat Rock State Park on April 7. They assert that this search violated their Fourth Amendment rights because, contrary to the district court's finding, no exigent circumstances justifying the search existed.

■ When the government has conducted a search without complying with the warrant requirement, it has the burden of

21, United States Code, Sections 841(a)(1) and 812, and Title 18, United States Code,

Section 2.

showing that a justification exists. *United States v. Gardner*, 627 F.2d 906, 909 (9th Cir. 1980); *United States v. Hoffman*, 607 F.2d 280, 282 (9th Cir. 1979); *United States v. Dugger*, 603 F.2d 97, 99 (9th Cir. 1979). The so-called "exigent circumstances" justification exists when there is " 'a substantial risk of harm to the persons involved or to the law enforcement process . . . if the police . . . delay a search until a warrant [can] be obtained.' " *United States v. Gardner*, 627 F.2d at 909 (quoting *United States v. Robertson*, 606 F.2d 853, 859 (9th Cir. 1979)). The need for the search must be readily apparent to the police and so strong that it outweighs the important Fourth Amendment protections provided by the warrant requirements. *Id.*

■■■■■ The question whether exigent circumstances exist is largely a factual one. *United States v. Williams*, 630 F.2d 1322, 1327 (9th Cir. 1980); *United States v. Flickinger*, 573 F.2d 1349, 1356–57 (9th Cir.), *cert. denied*, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). Our review of a district court's finding of exigent circumstances based on specific findings of fact, as required by Fed.R.Crim.P. 12(e), must be pursuant to the clearly erroneous standard. *United States v. Gardner*, 627 F.2d at 909; *United States v. Dugger*, 603 F.2d at 99; *United States v. Flickinger*, 573 F.2d at 1356–57. *See also United States v. Williams*, 630 F.2d at 1327; *United States v. Bates*, 533 F.2d 466, 468 (9th Cir. 1976) (when district court's finding of exigency not accompanied by written findings of fact, we independently review the record applying the constitutional criteria of reasonableness).

■■■■ Our review commences by observing that, inasmuch as *Bernard I* found that no probable cause to arrest existed until just immediately before the arrests took place, 623 F.2d at 558–61, a warrant to search the motor home could not have been obtained at an earlier time. The issue is whether the search ought to have been deferred until after a warrant could have been obtained. Relying on *Williams* the district court thought not. In *Williams* a finding of exigency to search a motor home *five* hours after the arrests was based on

the need of agents to enter to check on the explosiveness of the chemicals. Here, the need to check was even more urgent. The agents knew that the parties in the motor home had been "cooking" chemicals and that Brock had rushed out of the motor home choking from the fumes. As the district court found, these facts, combined with the agents' knowledge of the explosiveness of the chemicals used in making methamphetamine, justified the agents' belief that the motor home had to be searched to avoid a possible explosion. Moreover, the agents were unaware exactly who was in the motor home and whether all occupants had exited. Indeed, until Bernard exited, they had not been aware that he was even present. We cannot say that we are left with a "definite and firm conviction that a mistake has been committed," and thus the district court's finding of exigency was not clearly erroneous. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *United States v. Gardner*, 627 F.2d at 911. This contention also must fail.

5. *Warrantless Monitoring of Beepers*

Appellants next contend that the government's warrantless monitoring of the electronic beeper in the canister of methylamine while it was located in the Meacham cabin constituted an unreasonable search in violation of their Fourth Amendment rights. This issue raises difficult and troubling questions. Adaptation of Fourth Amendment values and jurisprudence to the electronic age into which we are rapidly moving presents a challenge with which this nation will be concerned for some time to come. The Fourth Amendment implications of the use of electronic beepers already has divided the circuits and provoked a great deal of commentary. *See, e.g.*, Note, *Tracking* Katz; *Beepers, Privacy, and the Fourth Amendment*, 86 Yale L.J. 1461 (1977). Beepers are a new electronic law enforcement aid the purpose of which is to enhance the ability of agents to follow the movements, or to discover the whereabouts, of suspects.

■■■ We hold that the monitoring of the beeper while it was in the Meacham cabin

did not constitute a search. Consequently, no warrant was required, and appellants' Fourth Amendment rights were not violated. We state our holding in this manner because appellants are challenging neither the installation of the beeper in the canister,[4] nor the monitoring of the beeper to track the car from Lewiston, Idaho to Clarkston, Washington, until the signal was lost,[5] nor the monitoring of the beeper when it was in the residence in Clarkston, nor the monitoring of the beeper by airplane to locate its presence in the Meacham cabin on March 27 after DEA agents had lost the signal a second time.[6] Thus, the only issue before us is whether the monitoring of the beeper while it was in the Meacham cabin on March 27 and 28 before a warrant was obtained was a search.

The starting point of our analysis is *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In *Katz* the prosecution introduced evidence of phone conversations that had been obtained by FBI wiretaps of a public telephone booth. *Id.* at 348, 88 S.Ct. at 509. The Court, in holding that the Fourth Amendment had been transgressed, noted that the Amendment "protects people, not places." 389 U.S. at 351, 88 S.Ct. at 511. The Court focused on the privacy interest of the individual as the fundamental interest protected by the Fourth Amendment, *id.* at 351–54, 88 S.Ct.

at 511–12,[7] and explicitly rejected the notion that property interests control Fourth Amendment analysis. *Id.* at 353, 88 S.Ct. at 512. "[T]he reach of [the] Amendment [does not] turn upon the presence or absence of a physical intrusion into any given enclosure." *Id.* Stressing the "people" rather than "places" theme, the Court concluded by noting that considerations of privacy, and the consequent Fourth Amendment protections, do not vanish when the setting is a telephone booth, rather than a home or a hotel room. *Id.* at 359, 88 S.Ct. at 515. It stated:

> Wherever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures. The government agents here ignored "the procedure of antecedent justification ... that is central to the Fourth Amendment," (footnote omitted) a procedure that we hold to be a constitutional precondition of the kind of electronic surveillance involved in this case.

*Id.*

It is Justice Harlan's formulation of the privacy test that has been most frequently applied since *Katz. See, e.g., Smith v. Maryland*, 442 U.S. 735, 739–41, 99 S.Ct. 2577, 2579–80, 61 L.Ed.2d 220 (1979); *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12, 99 S.Ct. 421, 430 & n.12, 58 L.Ed.2d 387 (1978). That formulation requires a two-step analy-

---

**4.** Indeed, they would not have standing to challenge the installation because it was accomplished while the canister was lawfully in the possession of the DEA.

**5.** Such a challenge is precluded by our holding in *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978), that monitoring a beeper lawfully installed in a car traveling on a public thoroughfare is not a search.

**6.** At oral argument appellants contended that intercepting the signal by plane from the Meacham cabin was a search. They later stated that they were only challenging as a search the warrantless monitoring after the beeper was initially detected by plane, and that locating the beeper signal was not a search. In their briefs they contended they were challenging only the warrantless monitoring. In any event, because we find no search resulted from the monitoring itself, *a fortiori*, the process of locating the signal was not a search.

**7.** The court noted, however, that the Fourth Amendment cannot be equated with a general "right to privacy," that Fourth Amendment "protections go further" than simply protecting privacy interests, and that often its protections "have nothing to do with privacy at all." 389 U.S. at 350, 88 S.Ct. at 510. *See also* Amsterdam, *Perspectives on the Fourth Amendment*, 58 Minn.L.R. 349, 358 (1974).

We note also that because a finding of a Fourth Amendment violation results in the suppression of otherwise relevant evidence under the exclusionary rule, the interests of society are affected in any Fourth Amendment question. Society's interest is not explicitly considered, however, under current Fourth Amendment analysis. Therefore, the courts must carefully review Fourth Amendment questions so society's interest in law enforcement is not unnecessarily impaired. *See United States v. Michael*, 645 F.2d 252, 259–60 (5th Cir. 1981) (en banc) (Charles Clark, J., specially concurring).

sis: First, a "person [must] have exhibited an actual (subjective) expectation of privacy," [8] and second, "the expectation [must] be one that society is prepared to recognize as 'reasonable.'" 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

Outside of the wiretap context the Supreme Court has addressed the Fourth Amendment implications of the use of other "electronic gadgetry" only once. In *Smith v. Maryland, supra,* the Court held that the use of a "pen register," a device attached to telephone company equipment that records the numbers dialed on a telephone by monitoring the electrical impulses caused when the dial is released, did not constitute a search because there was no "legitimate expectation of privacy," 442 U.S. at 744, 99 S.Ct. at 2582, in the numbers dialed. *Id.* at 741–46, 99 S.Ct. at 2580–2583. The Court noted the "limited capabilities" of the pen register and the limited nature of the information elicited from a pen register. These characteristics distinguish the pen register from the wiretap in *Katz* which recorded the "contents" of the conversation. *Id.* at 741–42, 99 S.Ct. at 2580–81. The Supreme Court has yet to address the Fourth Amendment implications of the use of beepers. *See Miroyan v. United States,* 439 U.S. 1338, 99 S.Ct. 18, 58 L.Ed.2d 45 (1978) (Rehnquist, J., Circuit Justice).

This circuit has, however. In doing so we have examined separately the questions of installation and monitoring. That is, we have first determined if the installation of the beeper was in violation of the Fourth Amendment, and second, if not, was the Amendment violated by the monitoring. *United States v. Dubrofsky,* 581 F.2d 208, 211 (9th Cir. 1978). As already pointed out, only monitoring is at issue in this case.

Appellants contend that because the beeper was placed in chemicals that they had a legal right to possess, and because the monitoring was of a non-contraband item located in a private residence, a search has taken place. They argue that they exhibited a subjective expectation of privacy by taking the item into the home and that because the chemicals were not contraband, their expectation of privacy was reasonable. While it is true that some courts have held that there is no "legitimate" expectation of privacy in contraband, *United States v. Washington,* 586 F.2d 1147, 1154 (7th Cir. 1978); *United States v. Emery,* 541 F.2d 887, 889–90 (1st Cir. 1976); *United States v. Bailey,* 628 F.2d 938, 942 (6th Cir. 1980) (dictum),[9] we concede that the appellants' expectation of privacy was reasonable. The question before us rather is whether such a reasonable expectation has been invaded.[10]

**8.** Although the Harlan formulation speaks of an exhibition of a "subjective" expectation of privacy, the actual *exhibition* of that "subjective" expectation is judged by objective standards. *See United States v. Sledge,* 650 F.2d 1075, 1077 & n.2 (9th Cir. 1981).

**9.** There appears to be an inherent danger in conditioning the legitimacy or reasonableness of the expectation of privacy on whether the item is contraband. Given full rein, such a dividing line could then be used to limit Fourth Amendment protections by the nature of the item seized, regardless of the reasonableness of the method used to obtain it. Would the warrantless physical search of a residence be reasonable because the occupants had no "legitimate" expectation of privacy in the heroin they kept in the house?

The Sixth Circuit in *Bailey* relied, *inter alia,* on our decision in *Dubrofsky* for its contraband/noncontraband distinction. 628 F.2d at 942. We did not make any such distinction with regard to whether a person's expectation of privacy was "legitimate." *Dubrofsky* was

addressing the installation of a beeper in contraband that was discovered during a lawful customs search. The court noted that because the package was *lawfully opened* during a customs search, "the mere insertion of the [beeper] did not violate any Fourth Amendment right." 581 F.2d at 211. *Dubrofsky* simply did not address the effect that the nature of the item had on a person's "reasonable" expectations of privacy.

Also, the Seventh Circuit in *Washington* relied on the First Circuit's decision in *United States v. Moore,* 562 F.2d 106 (1st Cir. 1977), *cert. denied,* 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978). 586 F.2d at 1154. *Moore* also did not so hold; indeed, in *Moore* the beeper was placed in "legal" chemicals. 562 F.2d at 112–13. *But see United States v. Emery,* 541 F.2d 887, 889–90 (1st Cir. 1976) (clearly drawing the contraband/noncontraband distinction).

**10.** Appellants note that this court and others have held that there is a lessened expectation of privacy when vehicles are traveling on the

In *Dubrofsky* we held that the monitoring of a beeper, lawfully installed in a package of heroin, that merely broadcast "here I am" and when appropriate "the package has been opened," did not constitute a search. 581 F.2d at 211. Although *Dubrofsky* dealt primarily with tracking a beeper in a car, the beeper was taken into a private residence where in due course it announced its presence and that the package was being opened. 581 F.2d at 211–12. On these facts we found no search. This was because the clearly recognized "intrusion" resulting from the presence of the beeper is very slight. *Id.* at 211. *Dubrofsky* compared the beeper's operation to other enhancement devices that aid the five senses. *Id.* at 211 & n.1. The Fifth Circuit recently made a similar comparison. *See United States v. Michael,* 645 F.2d at 258. *See also* Note, *Tracking, supra,* 86 Yale L.J. at 1461 (noting that "because the beeper is capable of revealing only location and movement, it can be viewed as a sense enhancement device that is no more intrusive than traditional visual tailing").

The degree of intrusiveness of sense enhancement devices of various types on the reasonable expectation of privacy has been the controlling inquiry in other Fourth Amendment contexts. *See United States v. Allen,* 633 F.2d 1282, 1288 (9th Cir. 1980) (helicopter used to observe ranch near sea coast which Coast Guard planes normally traveled near to or over); *United States v. Michael,* 645 F.2d at 256, 258 (installation of beeper on exterior of car parked in public parking lot). Here, appellants suffered no indignity. *United States v. Michael,* 645 F.2d at 258. The slight physical intrusion, by reason of the beeper itself, was insignificant. *Katz* has made it clear that strict property law concepts no longer control.[11]

More importantly, the beeper only says "here I am." It reveals nothing more about the contents of, or activities in, the residence. The Supreme Court noted in *Smith v. Maryland* that the wiretap in *Katz* was significantly more intrusive than was the pen register. 442 U.S. at 741–42, 99 S.Ct. at 2580–81. Likewise, there is a world of difference between a wiretap and a beeper that merely identifies location.

■ Although the beeper extends the capabilities of our senses beyond that which existed at the time of the adoption of the Fourth Amendment, the same can be said of such devices as the helicopter used in *Allen.* It is true that the sense of sight

open road or airways and are monitored by beeper. *See United States v. Michael,* 645 F.2d 257 (5th Cir. 1981) (en banc) (car); *United States v. Bruneau,* 594 F.2d 1190, 1197 (8th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979) (airplane); *United States v. Dubrofsky,* 581 F.2d at 211–12 (car); *United States v. Miroyan,* 577 F.2d 489, 492–93 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 258, 58 L.Ed.2d 243 (1978) (airplane); *United States v. Pretzinger,* 542 F.2d 517, 520 (9th Cir. 1976) (car); *United States v. Hufford,* 539 F.2d 32, 33–34 (9th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976) (car). They reason that this means there is a greater expectation of privacy in the home. This is true. They then reason from this point that, consequently, monitoring of a beeper in a home is a search. But moving the beeper from the car to the home does not make the monitoring a search. Monitoring in the home is only a search if appellants' reasonable expectation of privacy is invaded. We hold that in this case it was not.

11. The Sixth Circuit has criticized *Dubrofsky* and other cases which have "cast the problem in terms of intrusiveness." *United States v.*

*Bailey,* 628 F.2d 938, 940 n.4 (6th Cir. 1980). It stated that "[a]n intrusion is not de minimis if it violates an individual's legitimate expectation of privacy." *Id.* at 940.

We disagree with the Sixth Circuit's criticism. First, the Supreme Court has cast the question in terms of intrusiveness. *See, e.g., Smith v. Maryland,* 442 U.S. 735, 741–42, 99 S.Ct. 2577, 2580–81, 61 L.Ed.2d 220 (1979). Additionally, unless there is an "invasion" of the defendant's interest, the fact that the defendant had a reasonable expectation of privacy, is immaterial. In order to determine if it is "reasonable" for society to recognize the defendant's expectation of privacy, one must determine the degree of intrusiveness. To say that an intrusion is not de minimus if it violates the expectation is to beg the question. It does not *violate* the expectation unless it is sufficiently intrusive. *See also United States v. Michael,* 645 F.2d at 256, 258 (5th Cir. 1981) (en banc) (Brown, J., concurring); *id.* at 259–60 (Charles Clark, J., specially concurring) (both opinions would have found no search in the installation of a beeper on a car in a public parking lot).

does not allow one to see through walls, and that the beeper's sense enhancement constitutes a dramatic increase in one's surveillance capabilities. But, so also does a dog's sense of smell enhance one's senses. Yet the use of dogs is not treated as a search. *See, e.g., United States v. Solis*, 536 F.2d 880, 881–83 (9th Cir. 1976), and *United States v. Bronstein*, 521 F.2d 459, 461–63 (2d Cir. 1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1121, 47 L.Ed.2d 324 (1976). Accordingly, we hold that under the facts of this case the minimal intrusion occasioned by the use of the location beeper lawfully installed in a noncontraband item that was taken into a private residence is not a search. Thus, no warrant was required.

The principle upon which our holding rests is not without limits. Were the beeper to relate more information than simply location, its resemblance to the wiretap in *Katz* would increase. At some point the amount and specificity of the information revealed and the duration of the monitoring would require the use of the particular sense-enhancement device to be characterized as a search. *See United States v. Dubrofsky*, 581 F.2d at 211–12. It is important to note that the beeper in this case was monitored for only two days before a search warrant was sought. We note with approval the statement in *United States v. Cofer*, 444 F.Supp. 146 (W.D.Tex.1978), addressing the question of continued beeper surveillance of unlimited duration:

> [T]he [c]ourt cannot countenance the potentially unlimited duration of this type of surveillance [location beepers]. Citizens have a right to think that the government will not track them for months on end by resort to the latest electronic gadgetry.

444 F.Supp. at 149–50 (*quoted with approval in United States v. Allen*, 633 F.2d at 1289 n.5).

### 6. *Warrant to Search Meacham Cabin*

Appellants next attack the search warrant issued March 31 insisting that it is invalid for lack of particularity and probable cause. We shall address each of these contentions.

### A. *Particularity*

 The warrant authorized a search for "chemicals and glassware commonly utilized in the manufacture of methamphetamine, and other narcotic paraphernalia, including notes, instructions, formulas, ...." This warrant is undoubtedly specific enough to satisfy the general requirement that, to be valid, a warrant must be reasonably specific, rather than elaborately detailed, in its description of the objects of the search. *See, e.g., Andresen v. Maryland*, 427 U.S. 463, 479–82, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976) (warrant upheld for the seizure of "other fruits, instrumentalities and evidence of crime at this [time] unknown.")

Despite the warrant's reasonable specificity, appellants object, however, to the failure of the warrant specifically to mention the canister of methylamine, which, from the beeper monitoring, was known to be in the cabin. They rely on a sentence, taken out of context, from *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The issue in *Coolidge* was whether items in plain view could be seized *without a warrant*. In the course of its discussion the plurality opinion stated:

> If the initial intrusion is bottomed upon a warrant that fails to mention a particular object, though the police know its location and intend to seize it, then there is a violation of the express constitutional requirement of "Warrants ... particularly describing ... [the] things to be seized."

403 U.S. at 471, 91 S.Ct. at 2040. This was said to substantiate the plurality's conclusion that the plain view exception to the warrant rule had to be qualified by a requirement that the discovery of the items be inadvertent. The plurality was concerned that officers would know exactly where an item was to be found, proceed to the location, and without a warrant seize the item, claiming that it was in plain view.

This concern is not relevant to a situation in which a search was made pursuant to a reasonably specific warrant adequately describing in general terms what the officers

knew was in the residence. *Coolidge* did not hold that all warrants must list in specific detail every item that agents know is likely to be found in a certain location. It does not change the traditional standard of reasonable specificity. Here, it is apparent that a canister of methylamine is included within the scope of the warrant as "chemicals ... commonly utilized in the manufacture of methamphetamine."

■ Moreover, even if it were the law that the warrant had to refer specifically to the canister, the affidavit, which supported the warrant and was incorporated into it, described the canister, its travels, and its location in the cabin. When a warrant incorporates an affidavit and the affidavit specifically lists the items expected to be found, the warrant and affidavit together satisfy the specificity requirement. *United States v. Marques*, 600 F.2d 742, 752 (9th Cir. 1979), *cert. denied*, 444 U.S. 1019, 100 S.Ct. 674, 62 L.Ed.2d 649 (1980).

B. *Probable Cause to Support Warrant*

Having held that the beeper's use under the facts of this case did not constitute a search, it follows that there was probable cause to issue the warrant.

■ Appellants make the somewhat surprising argument that the arrests on April 7 vitiated probable cause to search the cabin on April 8. Since the police seized them and some chemicals at Hat Rock State Park, the appellants argue that the police should have assumed that all elements of the operation had been removed from the cabin and placed in the mobile home. There is nothing to support this contention. It was reasonable for the agents to believe that some paraphernalia remained in the cabin. The members of the conspiracy had been accumulating large quantities of chemicals, the lab in the mobile home was relatively small, and the beeper indicated that on April 7, the canister was still in the cabin even though the defendants were in the trailer at the park.

7. *Sufficiency of the Evidence*

■ Appellants' sufficiency of the evidence argument need not long detain us. A review of the record clearly shows that the evidence was sufficient to support the con-victions. The standard we must use in reviewing the sufficiency of the evidence to support a criminal conviction is familiar. We must view the evidence in the light most favorable to the prosecution and affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). The evidence in this case was clearly sufficient.

AFFIRMED.

ADAMS, Circuit Judge, concurring.

I concur in the decision to affirm these convictions. I write separately, however, for two related reasons. First, I think it important to make clear that one of the issues raised by the appellants—namely, the legality of warrantless "beeper" surveillance—is considerably more complicated than might be immediately apparent from Judge Sneed's opinion. Other courts of appeals have faced factual situations nearly identical with the case at bar and, after rational analyses, have arrived at a conclusion directly contrary to that endorsed by today's majority. The First Circuit, in *United States v. Moore*, 562 F.2d 106 (1st Cir. 1977), *cert. denied*, 435 U.S. 926, 98 S.Ct. 1493, 55 L.Ed.2d 521 (1978), the Sixth Circuit, in *United States v. Bailey*, 628 F.2d 938 (6th Cir. 1980) and the Eighth Circuit, in *United States v. Knotts*, 662 F.2d 515 (8th Cir. 1981), have held that the warrantless use of a beeper to locate noncontraband materials inside a private residence is indistinguishable from a warrantless search of that same residence. Rather than actually opening the door to determine whether certain items were inside a building, the courts reasoned, the agents instead employed beepers to gather exactly the same information. Consequently, these courts concluded that the agents should have secured a warrant before they monitored beeper signals emanating from private areas such as a home. The *Bailey* court set forth its fourth amendment analysis succinctly:

In essence, the question before the court is whether the law is prepared to recognize as legitimate an individual's expec-

tation of privacy with respect to what he does in private with personal property he has a right to possess. The question is its own answer. Beeper surveillance of non-contraband personal property in private areas trenches upon legitimate expectations of privacy and constitutes a search or seizure within the meaning of the fourth amendment.

*Bailey, supra,* 628 F.2d at 944.

There is much to commend in the analysis advanced in the *Moore, Bailey,* and *Knotts* cases. I am convinced, however, that the validity of warrantless beeper usage within the Ninth Circuit is not, in light of previous decisions of this Court, an open question. In *United States v. Bernard,* 625 F.2d 854 (9th Cir. 1980), this Court rejected a fourth amendment challenge brought by co-defendant Bernard to the same beeper in the same canister of methylamine as involved here.

While *Bernard,* standing alone, does not fully resolve the weighty constitutional arguments presented by appellants in the case at bar, it is controlling when read in conjunction with *United States v. Hufford,* 539 F.2d 32 (9th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976), and *United States v. Dubrofsky,* 581 F.2d 208 (9th Cir. 1978). As Judge Sneed's opinion in this case makes clear, the Ninth Circuit, unlike other courts of appeals, does not consider dispositive any distinctions between beepers placed in noncontraband material and those planted in contraband material, or between beepers monitored in private areas and those attached to moving vehicles. For this reason, I concur in today's decision.

Second, I write separately because I am somewhat concerned, as a practical matter, about the apparently increasing use of modern reconnaissance devices such as the beeper deployed here, without first applying to a neutral magistrate for a warrant. In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), Justice Harlan, in his concurring opinion, stressed that "under the Fourth Amendment, warrants are the *general rule,* to which the legitimate needs of law enforcement may demand specific exceptions." *Id.* at 362, 88 S.Ct. at 517 (emphasis added). That observation bears repetition in this case. In both *Moore* and *Bailey,* the courts noted that the agents monitored beepers without a warrant even though it apparently was entirely feasible, under the circumstances, to obtain antecedent judicial approval of the surveillances. A similar conclusion can be drawn from the facts in this case. I find it difficult to believe, especially given the previously observed pattern of suspicious activity involving the procurement of methylamine and phenyl-2-propanone, that the agents here would have been unable to convince a neutral, detached magistrate that a warrant should have been issued to monitor signals coming from the beeper that was concealed in the canister. I am not unmindful of the many burdens and constraints that have been imposed upon law enforcement officials, particularly in drug-related investigations. Still, in light of the frequency with which the exclusionary rule has been applied in the fourth amendment context,[1] I fail to understand why, in close cases such as this, a warrant is not obtained when prudence clearly would counsel otherwise. As a result of today's decision and its precursors, policemen and agents within the Ninth Circuit are not legally obligated to acquire warrants before installing and monitoring electronic beepers, at least under circumstances similar to those involved here. I would suggest, however, that in future instances warrants nonetheless be obtained, particularly because, when the Supreme Court speaks on this issue, it conceivably may choose to follow the First, Sixth, Eighth Circuits rather than this Court. Such a course might invalidate convictions that are based on information obtained by the use of beepers.[2] According-

---

1. See *Government of Virgin Islands v. Rasool,* 657 F.2d 582 (3d Cir. 1981) (Adams, J., concurring).

2. *But see United States v. Cassity,* Cr. No. 77–80932 (E.D.Mich. Aug. 27, 1981) (discussed at 50 U.S.L.W. 2181) (declining to apply *Bailey* retroactively to invalidate warrantless beeper

ly, I would hope that, until the law of the Ninth Circuit becomes the law of the land, law enforcement officials in this Circuit and elsewhere take those precautions necessary to ensure that the hard-earned convictions they secure will not be set aside.[3]

FLETCHER, Circuit Judge, concurring:

I concur fully in Judge Adams' opinion and I concur in the result of Judge Sneed's opinion.

Judge Adams writes separately, from the perspective of a judge from a circuit other than the ninth. Sitting as a visiting judge of the Ninth Circuit in this case, he of course finds himself bound by Ninth Circuit precedent but nonetheless moved to report that other circuits, confronted with the facts of this case, would reach a different result and, in his view, for sounder reasons than those expressed by Judge Sneed, in his opinion.

I write as a Ninth Circuit Judge bound by Ninth Circuit precedent that compels the result Judge Sneed reaches, but not bound to agree with his fourth amendment analysis.

Judge Sneed takes *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), as the starting point for his analysis, as do I, but we do not agree as to its import.

The petitioner in *Katz* was convicted of transmitting wagering information in violation of a federal statute. At trial, the government introduced evidence obtained from the attachment of microphones and recording devices to the outside of public telephone booths used by the petitioner. This Circuit, stressing the absence of any physical penetration into the phone booths, upheld the admission of the recordings. The Supreme Court reversed.

In reaching its decision, the *Katz* Court rejected prior fourth amendment analysis that had single-mindedly focused on "constitutionally protected areas" and the neces-

sity of finding a technical trespass. The majority stated:

> [T]his effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case. For the Fourth Amendment protects people not places. What a person knowingly exposes to the public, even in his home or office, is not a subject of Fourth Amendment protection. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351–52, 88 S.Ct. at 511–12 (footnotes and citations omitted).

In the most enigmatic portion of its opinion, the majority concluded that the government's surveillance technique "violated the privacy upon which [the petitioner] justifiably relied while using the telephone booth." *Id.* at 353, 88 S.Ct. at 512. The underlying analysis emphasized justifiable expectations of privacy.

Although *Katz* is especially noteworthy for abandoning analysis based on "constitutionally protected areas" and for eliminating technical trespass as a requirement for finding an illegal search, it also is significant for what it left intact. Most important is the continuing relevance of examining the physical characteristics of the area searched as part of the fourth amendment analysis. Immediately after penning the maxim, "[T]he Fourth Amendment protects people, not places," the majority held that just as the fourth amendment protects one while in a friend's apartment, a business office, or taxicab, the same protection includes the occupant of a public telephone booth. *Id.* at 352, 88 S.Ct. at 511. Thus, because the *Katz* expectation of privacy must be a reasonable one, and because physical surroundings of necessity form a part of what is reasonable, the appropriateness of viewing fourth amendment problems in the context of the immediate physical surroundings is not open to doubt.

---

surveillance that was conducted in good faith before date of Sixth Circuit decision).

**3.** The Eighth Circuit, in a decision rendered after oral argument in this matter and after this opinion had been prepared, joined the

One of the problems with Judge Sneed's analysis is that it is completely void of any discussion of the defendants' expectation of privacy in their home. It draws no distinction whatsoever between beeper surveillance of a suspect on the street and monitoring him inside his home. Contrary to Judge Sneed's view, *Katz* does not preclude such analysis; in fact, it is necessary to any determination of reasonable expectations of privacy under *Katz*.

Justice Harlan, concurring in *Katz*, suggested that the limits of fourth amendment protection are seldom discoverable without reference to place. *Id.* at 361, 88 S.Ct. at 516. He also concluded that two requirements emerged from previous decisions: a person must exhibit an actual (subjective) expectation of privacy, and the expectation must be one that society is prepared to recognize as reasonable. *Id.*

As noted by Judge Sneed, a majority of the Court eventually adopted the two-pronged analysis of Justice Harlan's concurrence when it decided *Smith v. Maryland*, 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2579–80, 61 L.Ed.2d 220 (1979). After noting that the application of the fourth amendment has consistently depended on demonstration of a "legitimate," "reasonable," or "justifiable" expectation of privacy, *id.* at 740, 99 S.Ct. at 2579 the Court concluded that Justice Harlan was correct in suggesting that the *Katz* inquiry requires an analysis of both subjective and objective expectations of privacy. But the court was quick to recognize that the two-pronged test, itself, is not fully adequate:

> For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation of privacy regarding their homes, papers, and effects.... [t]hose subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth

Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

*Id.* at 740, n. 5, 99 S.Ct. at 2579 n.5.

One of the foundations of the fourth amendment is the right of the people "to be secure in their ... houses." Unfortunately, Judge Sneed, in reviewing fourth amendment questions, has chosen to balance the rights of the people to be secure in their homes against the needs of law enforcement. *See* Judge Sneed's opinions in this case and *United States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978). Fourth amendment protections should not be eroded, however, merely because the government has a strong suspicion as to the identity of the perpetrator of a serious crime. A long line of Supreme Court decisions demonstrates that balancing is undertaken only after it is concluded that there has been a search. *See, e.g., Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2578, 45 L.Ed.2d 607 (1975); *Terry v. Ohio*, 392 U.S. 1, 16, 20–21, 88 S.Ct. 1868, 1877, 1879, 20 L.Ed.2d 889 (1968). The initial determination as to whether the government's intrusion on the privacy of one's home constitutes a search is not subject to such a balancing test. It should be subject instead to careful scrutiny by this court. Yet Judge Sneed, writing for the court in *Dubrofsky*, held that the monitoring of a tracking device located inside a private residence did not constitute a search, without any discussion of the special privacy interests inherent in the home. He reaches the same conclusion today.

I find myself in the difficult position of acquiescing in the government's conduct in this case because I am bound by *Dubrofsky*.

First and Sixth Circuits in holding that a warrantless beeper surveillance of a "private area" violates the Fourth Amendment.

*See* United States v. Knotts, 662 F.2d 515 (8th Cir. 1981).