UNITED STATES of America,
Plaintiff-Appellee,

v.

Carlos DURADES, Defendant-Appellant.

No. 78–1815.

United States Court of Appeals,
Ninth Circuit.

Sept. 14, 1979.

Howard B. Frank, Frank & Milchen, San Diego, Cal., for defendant-appellant.

Stephen W. Peterson, Asst. U. S. Atty. (on the brief), Michael H. Walsh, U. S. Atty., Howard A. Allen, Asst. U. S. Atty., (argued), San Diego, Cal., for plaintiff-appellee.

Before TRASK and WALLACE, Circuit Judges, and HOFFMAN,* District Judge.

TRASK, Circuit Judge.

Carlos Durades appeals from his conviction for conspiracy to possess heroin with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846. We reverse.

The facts may be briefly summarized. Starting in 1972, Javier Gaxiola regularly shipped narcotics from Mexico to Pedro Lugo, a Los Angeles nightclub owner. Lugo then distributed the drugs to various retailers, retaining a commission for his services. In February or March of 1975, Lugo ceased doing business with Gaxiola because he feared they were being watched by federal authorities. After a hiatus of several months, Lugo began receiving shipments of narcotics from a different supplier, Ted Rodriguez. In September 1975, Lugo met with Durades in Chicago. Each informed the other that he dealt in large quantities of heroin. A few weeks later Durades telephoned Lugo to order a kilo of heroin for a price of between $24,000 and $26,000. Rodriguez supplied Lugo with the quantity requested, and a bouncer employed at Durades' Chicago nightclub took delivery at Lugo's club in Los Angeles.

Lugo was arrested on drug charges in October 1976. Following his conviction in March 1977 for conspiracy to possess narcotics with intent to distribute, Lugo began to cooperate with federal authorities. At their request, he placed three recorded telephone calls to Durades in Chicago. They discussed narcotics, and during one of the conversations Lugo introduced an undercover federal agent as a potential buyer of heroin. A meeting between Durades and the agent was arranged. At that meeting, which was held on June 1, 1977, narcotics were discussed, but none changed hands. Durades, Gaxiola, Rodriguez, and six others were indicted on June 30, 1977. After a bench trial, Durades was convicted of one count of conspiracy to possess heroin with intent to distribute.

■ Durades attacks his conviction on the ground that there was a prejudicial variance between the indictment and the government's proof. A conviction must be reversed "if the variance between the indictment and the proof affects the substantial rights of the parties." *United States v. Friedman*, 593 F.2d 109, 116 (9th Cir. 1979). First we must ask whether there was, in fact, a variance. If there was, we must then answer a second question: was the variance prejudicial?

■ Having reviewed the record, we conclude that there was a significant variance. Whereas the indictment alleged that Durades, Lugo, Rodriguez, Gaxiola and others took part in a single conspiracy which began in 1972 and ended in 1977, the proof adduced by the government at trial showed there were at least two conspiracies during this period, and Durades was a participant in only one of them. The first conspiracy involved Lugo, Gaxiola, and certain drug retailers, but not Durades. It commenced in mid-1972 and lasted until February or March 1975, when Lugo stopped doing business with Gaxiola. The second conspiracy was born at the Chicago meeting between Durades and Lugo, which took place in September 1975, several months after the death of the first conspiracy. Apart from Lugo, the second conspiracy had a different cast of characters than the first (Lugo, Durades, Durades' bouncer, and Rodriguez were the second conspiracy's principal figures). Although Durades knew that Lugo was a dealer in large quantities of narcotics before he entered into an agreement with him, there is no proof that Durades was ever made aware of the existence of the Lugo-Gaxiola conspiracy. The success of the Lugo-Rodriguez-Durades drug ring did not depend upon the activities of the defunct Lugo-Gaxiola network. The government succeeded in proving that Lugo was the hub of the two separate conspiracies but failed to show that there was some kind of

---

* Honorable Walter E. Hoffman, Senior United States District Judge, for the Eastern District of Virginia, sitting by designation.

rim binding the spokes. Therefore, the indictment should not have charged Durades with participating in a single overall conspiracy lasting from 1972 until 1977. *See Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Baxter,* 492 F.2d 150, 158–59 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974); *Daily v. United States,* 282 F.2d 818 (9th Cir. 1960).

 We now turn to the question whether the variance between the indictment and the proof infringed one of Durades' substantial rights, *viz.* his interest in being tried only in a district where venue properly lay. We answer in the affirmative. "[T]he law is that an overt act committed in the course of a conspiracy which occurs in a district gives rise to jurisdiction to prosecute the conspirators in that district." *United States v. Barnard,* 490 F.2d 907, 910 (9th Cir. 1973), *cert. denied,* 416 U.S. 959, 94 S.Ct. 1976, 40 L.Ed.2d 310 (1974). Had there been but one conspiracy, as the government claims, venue would have been proper in the Southern District of California because members of the Lugo-Gaxiola group committed overt acts there during the 1972–75 period. However, since there were actually two separate conspiracies, and since the government failed to prove that any overt act was committed in the Southern District of California after the Lugo-Rodriguez-Durades conspiracy came into existence in September 1975, venue did not lie there.[1] By raising the venue issue at the proper time, Durades preserved his right to trial in a district where the crime was allegedly committed. U.S.Const. art. III, § 2; *id.,* amend. VI. Venue lay in the Central District of California, in the Northern District of Illinois, and perhaps elsewhere, but it did not lie in the Southern District of California. Accordingly, we REVERSE.[2]

---

1. Venue can be established either directly or circumstantially but must be proved by a preponderance of the evidence. *United States v. Powell,* 498 F.2d 890, 891 (9th Cir.), *cert. denied,* 419 U.S. 866, 95 S.Ct. 121, 42 L.Ed.2d 103 (1974). Passing through or over a district while en route to obtain or deliver illegal narcotics is sufficient to establish venue in that district. *United States v. Williams,* 536 F.2d 810, 812 (9th Cir.), *cert. denied,* 429 U.S. 839, 97 S.Ct. 110, 50 L.Ed.2d 106 (1976). The government introduced evidence that Rodriguez occasionally obtained narcotics from a man in Mexicali, Mexico, which is located contiguous to the southern boundary of the Southern District of California. If the government had proved that the particular kilo of heroin which Rodriguez delivered to Lugo's nightclub originated in Mexicali and came to Los Angeles by the most direct route, transit through the district could have been inferred. However, the government did not produce any evidence pertaining to the source of the heroin. Consequently, the trier of fact had no basis for infer-

ring that Rodriguez passed through the Southern District of California on his way to Los Angeles. There being no other evidence of acts committed in the district, Durades' objection to standing trial there was well-founded. *Compare United States v. Trenary,* 473 F.2d 680, 682 (9th Cir. 1973) ("Appellants argue that the Southern District of California did not have venue over the conspiracy count because there was no direct proof that the co-conspirators in driving from Newport Beach to Mexico in furtherance of the conspiracy, passed through that district. . . . Judicial notice may be taken of a map of the area and, considering the time factor, the distance covered and the probable source of the marijuana, it was more reasonable than not that the two drove the car along the coast, by the shortest direct route to reach Mexico.")

2. In light of our disposition, we need not decide the other questions presented on appeal.