UNITED STATES of America, Plaintiff-Appellee,

v.

Natividad DURAN, Defendant-Appellant.

United States of America, Plaintiff-Appellee,

v.

Martin Roman, Defendant-Appellant.

United States of America, Plaintiff-Appellee,

v.

Rodolfo Almaraz Mora, Defendant-Appellant.

Nos. 98–50116, 98–50205, 98–50329.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 12, 1999.

Decided Aug. 31, 1999.

Michael M. Crain, Los Angeles, California, for defendant-appellant Mora; Karen L. Landau, Oakland, California, for defendant-appellant Roman; Joseph F. Walsh, Los Angeles, California, for the defendant-appellant Duran.

Patrick W. McLaughlin, Assistant United States Attorney, Los Angeles, California, for the plaintiff-appellee.

Before: BRUNETTI, RYMER and SILVERMAN, Circuit Judges.

RYMER, Circuit Judge:

Natividad Duran and Rodolfo Almaraz Mora appeal their jury convictions, and Martin Roman appeals his conviction pursuant to a guilty plea, for conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Roman also appeals his sentence. Their appeal raises two principal issues. With respect to the first, we conclude that although there was a variance in proof between the single conspiracy alleged in the indictment and the two conspiracies shown at trial, the variance did not prejudice Duran or Mora's substantial rights. We also hold that the district court was not required to suppress disclosure of conversations obtained through a wiretap on a co-conspirator's cellular telephone after the instrument (and thus the electronic serial number), but not the telephone number, had been changed without the government's knowledge. As the other claims of error do not merit reversal, we affirm.

I

Pursuant to a court-authorized wiretap, the government intercepted a number of phone calls from Angel Montes's[1] residence in Rialto, California between October 16 and 18, 1996. During two of those calls, Gloria Gonzalez spoke with Montes, her son, about obtaining "chofes" or drivers for transporting drugs from El Paso to Houston, Texas. Gonzalez instructed Montes to have "Rudy" (Mora's nickname) pick up the drivers "because he's the only one who knows them." Gonzalez also asked Montes to make the reservations for the drivers and to inform her what time the drivers were scheduled to arrive.

Montes subsequently called Luis Murillo, who in turn called Gene Chu and asked him to transport drugs from El Paso to Houston, Texas in exchange for $15,000. Montes called Southwest Airlines and arranged for Chu and Jody Chen, Chu's girlfriend, to fly from Los Angeles to El Paso, Texas. On October 17, 1996, Chu and Chen went to the Los Angeles airport and picked up the tickets that had been reserved for them. However, they missed the flight on which they had been scheduled and had to take a later flight. When Chu and Chen did not arrive as scheduled, Mora, who was waiting at the airport for them, called Montes. Mora then learned that Chu and Chen had missed their flight.

When Chu arrived, he called Murillo and was instructed to call "Rudy." He did so and was told by Mora to go to the La

---

1. Angel Montes is also known as Angel Gonzalez. We refer to him as "Montes" to distinguish him from his mother and co-defendant, Gloria Gonzalez.

Quinta Hotel and spend the night there. The next day, October 18, Luis Gonzalez (Luis), Montes's father, picked up Chu and Chen from the La Quinta Hotel and drove them to Las Cruces, New Mexico. Luis obtained a room for Chu and Chen at the Best Western Hotel, where they spent the night. On October 19, Chu and Chen met Mora in a restaurant next to the Best Western. Mora informed them that he was waiting for the checkpoint near Alamogordo, New Mexico to close. Later that day, Mora and his son, Ruben Almaraz (Ruben), met Chu and Chen at the Best Western. They gave Chu a pager and discussed the route he would take to Houston. Mora also gave Chu a green Toyota Camry to use and $400 in spending money.

On October 20, Chu told Mora that he wished to move hotels to avoid suspicion. After Chu and Chen checked in to the La Quinta Hotel across the street from the Best Western, the three went to see if the checkpoint were closed. Mora drove the green Camry. They drove past the checkpoint and discovered that it was closed. Mora then turned the car around and headed back towards Las Cruces. Although it was afternoon, Mora turned on the headlights of the car. He also made a call on his cell phone. Mora then began honking at an oncoming van. Mora turned the car around again and began following the van. The van then pulled over to the side of the road. Chu and Chen got out of the Camry and into the van, which contained the drugs that they were to transport to Houston. Mora remained in the Camry, where he was joined by the original driver of the van. Chu and Chen then drove the van through the closed checkpoint to Alamogordo, New Mexico.

Mora eventually joined Chu and Chen in Alamogordo and informed them that he was unable to get their luggage from the La Quinta Hotel because the room was registered under Chen's name. Mora drove Chen back to the La Quinta Hotel, while Chu checked in to the Days Inn Motel in Alamogordo. Late that evening, Mora and Chen returned. Mora informed Chu that Ruben would be escorting the van to Highway 385 the next morning and that, from there, they would drive unescorted.

On the morning of October 21, Chu and Chen met Ruben at Denny's restaurant in Alamogordo. They confirmed that Ruben would follow them until they reached Highway 385. Chu and Chen, followed by Ruben in the green Camry, began to drive the van towards Artesia, New Mexico. Officers from the Artesia Police Department followed the van and the Camry and eventually pulled over both vehicles. The officers learned that Mora was the registered owner of the Camry. In addition, after Chu and Chen gave conflicting stories regarding their plans in New Mexico, the officers obtained consent from Chu to search the van. The officers' search revealed an interior, hidden compartment. The van was taken to the Artesia police station, where it was searched and 37 kilograms of cocaine were found. Chu subsequently admitted his role in the offense to the officers.

On January 3, 1997, the government obtained another court-authorized wiretap, this time on Montes's cellular phone. On January 28, 1997, Roman called Montes to report that he had met with someone who had agreed to sell him cocaine for $13,100 per kilogram. Roman explained that the sellers wanted to start with 50 kilograms, but if all went well, they would provide 200 kilograms. Montes told Roman to call him again in 15 minutes. When Roman did so, Montes reported that he was ready to "give [the deal] gas."

On January 29, Roman called Montes and informed Montes that he was "ready," but that he only had 22 kilograms because someone had "screwed [him] over" and taken over half of the drugs. Roman also confirmed the price of $13,100 per kilogram. Roman and Montes agreed to meet at "the little house." Later that day, Montes called the residence of his sister and Duran's girlfriend, Rita Montes (Rita), in La Puente, California. Duran, whom Montes referred to as "Ricardo," answered

the phone and reported that Rita was not home. Montes asked Duran to tell Rita that he might need her "to go get something" and that she should "be ready." Early that evening, Montes again called Rita's house and Duran answered the phone. Montes inquired about what was "going on" with Roman and asked if Roman were going to leave the drugs there. Duran responded, "Uh, I think so." Montes then asked to speak to Roman. He told Roman that he was "far away" and asked that Roman leave the drugs at the house. Roman stated that he would leave them "with this guy," referring to Duran. Montes asked to speak to Duran again. Montes told Duran that Rita was going to store the drugs for him until the morning and asked Duran to "verify" the amount of the drugs. Duran stated that there were 17 packages. Montes warned Duran not to "talk so clearly," to which Duran responded that he understood.[2] Finally, Roman got back on the phone and explained that there were only 17 packages, rather than the 22 that he had most recently promised.

Soon after the call between Duran, Roman, and Montes concluded, officers from the Riverside Police Department forced entry into Rita's residence. Duran and Rita attempted to run away, but were caught and detained in the house. Roman, who was attempting to leave the house in a car, was also detained. The officers found an open suitcase in one of the bedrooms that contained 17 kilograms of cocaine. An AK–47 rifle was recovered from the closet in the same bedroom. In addition, officers found a loaded semi-automatic handgun, an M–1 carbine rifle and Duran's Mexican birth certificate in the trunk of a Buick Century parked in the driveway of the residence. When Duran was later questioned at the Riverside Police Department, he admitted that he sometimes used the name "Ricardo," but denied knowing anything about the drugs.

On February 14, 1997, the grand jury returned a two-count indictment. The first count charged Gonzalez, Mora, Montes, Murillo, Chu, Chen, Roman, Duran, and Rita with conspiracy to distribute in excess of five kilograms of a substance containing cocaine. The second count charged Montes, Roman, Duran, and Rita with possession with intent to distribute more than five kilograms of a substance containing cocaine. Before trial, Roman and Duran filed a motion to suppress evidence seized from the wiretap of Montes's cell phone. The district court held a hearing on the motion and denied it. Duran also filed a motion to compel the government to grant use immunity to Rita, which the district court denied. Roman subsequently pled guilty to count one of the indictment, but reserved his right to appeal the denial of the motion to suppress the wiretap evidence. Gonzalez, Montes, Murillo, Chu and Chen also pled guilty to count one of the indictment, and the indictment was dismissed as to Rita Montes.

Duran and Mora proceeded to trial. Each moved for a judgment of acquittal based upon insufficient evidence at the close of the government's evidence and at the close of all of the evidence. The motions were denied. The jury convicted both on count one of the indictment, but was unable to reach a verdict on count two, which was consequently dismissed. Duran was sentenced to 240 months in custody and a five-year term of supervised release. Mora was sentenced to 120 months in custody and a five-year term of supervised release. Pursuant to his guilty plea, Roman was sentenced to 87 months in custody and a five-year term of supervised release. Duran, Roman, and Mora timely appeal their convictions and Roman appeals his sentence.

## II

Duran and Mora first argue that the evidence was insufficient to connect them

---

**2.** The government originally contended that it was Duran who warned Montes not to "talk so clearly." However, it later stipulated that

Montes was in fact the person who made that statement.

to a conspiracy to distribute cocaine. Secondly, they argue that even if the evidence is sufficient to connect them to a conspiracy, it is not the single conspiracy alleged in the indictment. Therefore, they contend that their convictions are infirm.

 We review sufficiency claims *de novo*. *See United States v. Bahena–Cardenas*, 70 F.3d 1071, 1072 (9th Cir. 1995). There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The issue of whether a single conspiracy has been proved is a question of the sufficiency of the evidence. *See United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir.1984).

### A

 Evidence is sufficient to connect a defendant to a conspiracy if it shows that the defendant had knowledge of and participated in the conspiracy. *See United States v. Vizcarra–Martinez*, 66 F.3d 1006, 1010 (9th Cir.1995). The evidence in this case was sufficient to connect Duran and Mora to a conspiracy to distribute cocaine. The phone conversations between Montes, Roman, and Duran, including Montes's use of the familiar name "Ricardo" with Duran, permitted the inference that Duran and Montes had a relationship and that Duran was knowingly assisting Montes in the drug deal with Roman. In one of their conversations, Montes asked Duran what was "going on" with Roman and if Roman was "going to leave something." In the same conversation, Roman indicated that he would leave the drugs with Duran and that Duran would count the packages of drugs. In response to Montes's request that Duran "verify it," Duran reported that there were "seventeen."

DEA Agent Sherman offered testimony to explain the meaning of the phone exchange between Montes, Roman and Duran. He testified that Montes was instructing Roman to leave the cocaine at the residence with Duran. Sherman further testified that when Montes instructed Duran to "verify it," he was "telling Mr. Duran to count the cocaine. Make sure there is, indeed, the agreed upon amount so that Mr. [Montes] knows that Mr. Roman is not shorting him on the kilos." Finally, Sherman explained that when Duran reported there were "seventeen," he was communicating that he had counted the drugs and confirmed for Montes that there were seventeen kilograms of cocaine.

In addition to the phone call evidence, there was evidence that the Buick that Duran had been driving (as evidenced by the presence of his birth certificate in the trunk of the car) contained a loaded semi-automatic handgun and an M–1 carbine rifle. Sherman testified that firearms and cocaine often go "hand in hand" because "traffickers moving a large amount of cocaine which has a high dollar value will generally arm themselves to protect themselves against possible rip offs from other traffickers." In addition, when the officers entered the La Puente residence, Duran attempted to flee. Finally, the evidence supported the inference that Duran resided in or had some control over the La Puente residence where the drugs were found. On Duran's own admission, he lived with Rita in that residence from March 1995 to September 1996. Moreover, he used the La Puente address on his DMV records and he answered the telephone at the La Puente residence on two occasions on January 29.

From this evidence, the jury could rationally deduce that Duran was aware that Roman was delivering seventeen kilograms of cocaine, and that Duran knowingly facilitated the exchange of the drugs by agreeing to store them in a residence over which he had some control and by counting the number of packages of drugs and assuring Montes that Roman was not taking advantage of him. That Duran arrived at the residence with guns in his car, one of which was loaded, supported the

inference that Duran came to the La Puente residence expecting to be involved in a drug deal. The jury had ample reason to disbelieve Duran's testimony that he knew Montes only because Montes was his girlfriend's brother; that he did not know Roman; that he did not count the drugs; that he merely repeated Roman's assertion that there were "seventeen," but was unaware that Roman was referring to drugs; that he did not own the gun and the rifle found in the Buick; and that he came to the house merely to ask Rita on a dinner date. First, Duran had a prior conviction for distribution of cocaine. Second, Duran's testimony was impeached several times. For instance, Duran denied that he ever used the La Puente address with the DMV, but DMV records listed the La Puente address as Duran's address. In addition, Duran testified that he arrived at the house at 6:00 or 6:30 p.m. for a dinner date with Rita, yet phone records showed that he was at the house as early as 3:48 p.m. Finally, Duran testified that Rita arrived at the house after he finished speaking to Montes for the second time. However, the transcript of his phone conversation indicates that Rita was in the house while Duran was speaking to Montes.[3]

Because the jury could properly disbelieve Duran, and the evidence was such that a rational jury could conclude that Duran was knowingly involved in a conspiracy to distribute cocaine, Duran's argument that the evidence was insufficient to connect him to a conspiracy fails. *See United States v. Taren–Palma*, 997 F.2d 525, 536 (9th Cir.1993) (rejecting a sufficiency of the evidence challenge where the evidence showed that the defendant was present during the drug transaction, confirmed the quality of the cocaine, and carried a weapon during the transaction).

 The evidence was also sufficient to permit a rational trier of fact to conclude that Mora was a member of a conspiracy to distribute cocaine. The evidence at trial established that Mora attempted to meet the drug couriers at the airport; instructed them where to go from the airport; planned the route they would take to Houston; lent them spending money, a pager, and a car; ensured that the checkpoint was closed before sending them to Alamogordo with the drugs; and lent Ruben his car to escort the couriers from Alamogordo to Highway 385. More importantly, the evidence established that Mora played an instrumental role in connecting the drugs and the couriers: after ensuring that the checkpoint was closed, Mora used his headlights, his cell phone, and his car horn to track down the van containing the drugs so that Chu and Chen could drive it through the checkpoint to Alamogordo. Because this evidence shows that Mora knew of the conspiracy and actively sought to further its ends, the evidence was sufficient to support his conviction. *See United States v. Friedman*, 593 F.2d 109, 116 (9th Cir.1979) (sufficient evidence to connect the defendant to the conspiracy where a conversation between the defendant and a co-conspirator demonstrated knowledge of the conspiracy and the defendant "engaged in affirmative conduct in furtherance of the conspiracy").

### B

Mora and Duran next argue that even if the evidence is sufficient to connect them to a conspiracy, it is not the conspiracy alleged in the indictment. They maintain that rather than demonstrating the single conspiracy alleged in the indictment, the evidence shows two separate conspiracies: one in New Mexico in October 1996, and one in Southern California in January 1997. We agree. However, we conclude that the variance was not prejudicial and therefore affirm their convictions.

---

**3.** This discrepancy is significant because the fact that Duran was answering the phone while Rita was in the house further bolsters the government's position that Duran was residing in, or had some control over, the La Puente residence.

i.

A single conspiracy can only be demonstrated by proof that "an overall agreement existed among the conspirators." *Bibbero,* 749 F.2d at 587. Furthermore, the evidence must show that "each defendant knew, or had reason to know, ... that his benefits were probably dependent upon the success of the entire operation." *United States v. Kearney,* 560 F.2d 1358, 1362 (9th Cir.1977). Typically, the inference of an overall agreement is drawn from proof of a single objective, *see, e.g., Taren–Palma,* 997 F.2d at 530 (a single agreement to sell ten kilograms of cocaine), or from proof that the key participants and the method of operation remained constant throughout the conspiracy. *See, e.g., Bibbero,* 749 F.2d at 587 (four key participants and method of operation remained relatively constant). The inference that a defendant had reason to believe that his benefits were dependent upon the success of the entire venture may be drawn from proof that the co-conspirators knew of each other's participation or actually benefitted from the activities of his co-conspirators. *See United States v. Arbelaez,* 719 F.2d 1453, 1459 (9th Cir.1983).

In this case, none of these circumstances is present. The sole link between the activities in New Mexico and the activities in Southern California three months later was Montes, but even this link is weak because Montes played different roles in each transaction. His role in the New Mexico–Texas activities was limited to making the arrangements for Chu and Chen to fly to El Paso so that they could transport 37 kilograms of cocaine from El Paso to Houston. In the California transaction, by contrast, Montes acted as a buyer and actively negotiated the purchase of cocaine from Roman. There was no evidence that the participants in either venture knew or had any reason to believe, solely by virtue of their connection to Montes, that their benefits were dependent upon the success of *both* operations. Indeed, the evidence suggests precisely the opposite. The conspiracy to transport drugs from El Paso to Houston apparently ended when Chu, Chen, and Ruben were arrested in Artesia, New Mexico. Then, three months later, another conspiracy began, with a different objective (purchasing cocaine rather than transporting it), different participants (Duran, Roman, Montes, and Rita instead of Montes, Mora, Ruben, Murillo, Gonzalez, Chu, Chen, and Luis), and different locale (Southern California instead of New Mexico and Texas).

Thus, this case is indistinguishable from *United States v. Durades,* 607 F.2d 818 (9th Cir.1979). In *Durades,* the evidence showed that beginning in 1972, conspirator Javier Gaxiola made regular shipments of narcotics to co-conspirator Pedro Lugo, who then distributed the drugs to different retailers. In February or March 1975, Lugo ceased doing business with Gaxiola. Several months later, Lugo began receiving shipments from Ted Rodriguez. In September of that year, Lugo met the defendant, Carlos Durades, and several weeks later Durades ordered a kilogram of heroin from Lugo. Rodriguez supplied the heroin to Lugo, who passed it on to Durades through the bouncer at Durades's nightclub. Durades was eventually arrested and, along with Rodriguez and Gaxiola, was charged with taking part in a single conspiracy to possess heroin with intent to distribute beginning in 1972 and ending in 1977. *See id.* at 819. We concluded that there was a variance between the indictment and the government's proof because, although the indictment alleged a single conspiracy, the proof at trial showed that there were at least two conspiracies:

The first conspiracy involved Lugo, Gaxiola, and certain drug dealers, but not Durades. It commenced in mid–1972 and lasted until February or March 1975, when Lugo stopped doing business with Gaxiola. The second conspiracy was born at the Chicago meeting between Durades and Lugo, which took place in September 1975, several months after the death of the first conspiracy. Apart from Lugo, the second conspiracy

had a different cast of characters than the first (Lugo, Durades, Durades' bouncer, and Rodriguez were the second conspiracy's principal figures). Although Durades knew that Lugo was a dealer in large quantities of narcotics before he entered into an agreement with him, there is no proof that Durades was ever made aware of the existence of the Lugo–Gaxiola conspiracy. The success of the Lugo–Rodriguez–Durades drug ring did not depend upon the activities of the defunct Lugo–Gaxiola network. The government succeeded in proving that Lugo was the hub of the two separate conspiracies but failed to show that there was some kind of rim binding the spokes.

*Id.* at 819–20.

As in *Durades,* the evidence here shows that the New Mexico–Texas conspiracy ceased when Chu, Chen, and Ruben were apprehended. Several months later, Montes, acting in a different role and with a "different cast of characters," *id.* at 819, began a second conspiracy. The success of one conspiracy was in no way dependent upon the success of the other. Although it is likely that both Mora and Duran understood that Montes was deeply involved in the distribution of large amounts of cocaine, the record is bereft of evidence that either Duran or Mora was aware of the conspiracy in which he did not participate or felt that the success of his venture was in any way dependent upon the success of the other. Thus, the evidence does not support the single conspiracy charged in the indictment, and there is a variance between the indictment and the government's proof.

**4.** Mora only raises this argument in his reply brief. Duran, on the other hand, nowhere argues that he was prejudiced by the variance between the indictment and the government's proof at trial. Nevertheless, we consider the issue whether the variance prejudiced Duran and Mora's substantial rights because the government fully briefed the issue. *See Interna-*

ii.

■■■ A variance warrants reversal only if it "affects the substantial rights of the parties." *United States v. Friedman,* 593 F.2d 109, 116 (9th Cir.1979) (citing *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Durades,* 607 F.2d at 820. A defendant's substantial rights may be prejudiced if he is exposed to "evidentiary spillover." *See United States v. Morse,* 785 F.2d 771, 775 (9th Cir.1986). Evidentiary spillover is prejudicial where it is "highly probable that [it] had substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239.

■■■ Mora argues that he was prejudiced by the evidentiary spillover from the case against Duran because the case against him was weak and was improperly bolstered by evidence that Montes, with whom he was connected in the New Mexico–Texas conspiracy, "actively negotiated for the purchase of cocaine in Los Angeles months later with persons who constructively possessed a loaded semi-automatic handgun."[4] Although this is not strictly a joinder objection, the principles used to assess whether joinder was prejudicial are relevant here and we rely on them to guide our analysis. *See Kotteakos,* 328 U.S. at 774, 66 S.Ct. 1239 (recognizing that the problem of variance between indictment and proof "is also essentially one of proper joinder").

■■■ Whether the evidence is easily compartmentalized is "of foremost importance" in assessing if joinder were prejudicial. *United States v. Vasquez–Velasco,* 15 F.3d 833, 846 (9th Cir.1994). Evidence is susceptible of compartmentalization when

*tional Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc.,* 752 F.2d 1401, 1404 & n. 4 (9th Cir.1985) (court has discretion to consider matters not specifically raised and argued in the appellant's opening brief "where the appellee is not misled and the issue has been fully explored").

the acts constituting the crimes that were allegedly misjoined are discrete. *See id.* Finally, any prejudice that might arise from joinder is minimized by instructing the jury to consider the evidence separately as it relates to each defendant. *See id.;* *United States v. Catabran,* 836 F.2d 453, 461 (9th Cir.1988) ("Ultimately, the question is whether the jury could follow the court's instructions and appraise the evidence against each defendant separately.") (internal quotations omitted).

As we have already concluded, the two conspiracies in this case involved discrete events separated by time, distance, purpose, method of operation, and personnel. As a result, the evidence pertaining to each conspiracy was easily compartmentalized. The only evidence connecting the two was Montes's involvement, but because his involvement in the two enterprises differed significantly, there is little risk that the jury was unable to keep the conspiracies separate. Further, the jury was instructed:

> It is your duty to give separate and personal consideration to the case of each individual defendant. When you do so, you should analyze what the evidence in the case shows with respect to that individual defendant, leaving out of consideration entirely any evidence admitted solely against some other defendant or defendants. Each defendant is entitled to have his case or her case determined from the evidence as to his or her own acts, statements, and conduct, and any other evidence in this case which may be applicable to he or she. The fact that you return a verdict of guilty or not guilty to one defendant should not in any way affect your verdict regarding any other defendant.

These instructions minimized the slight spillover risk that resulted from the joint trial of Duran and Mora by requiring the jury to consider each defendant's case separately. Of course, unlike the ordinary case where separate charges have been joined, the jury was not instructed to judge the two conspiracies separately. However, we fail to see how the jury could

have done otherwise since Duran and Mora were each involved in only one of the two conspiracies and the jury was instructed to "give separate and personal consideration to the case of each individual defendant."

In *Kotteakos,* on which Mora relies, the variance was deemed prejudicial where the evidence made out at least eight separate conspiracies involving thirty-two defendants. *See* 328 U.S. at 766, 66 S.Ct. 1239. In distinguishing *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), which held that the variance between the single conspiracy charged in the indictment and the proof of two conspiracies was not prejudicial, the *Kotteakos* Court explained:

> On the face of things it is one thing to hold harmless the admission of evidence which took place in the Berger case, where only two conspiracies involving four persons all told were proved, and an entirely different thing to apply the same rule where, as here, only one conspiracy was charged, but eight separate ones were proved, involving at the outset thirty-two defendants.... The sheer difference in numbers, both of defendants and of conspiracies proven, distinguishes the situation. Obviously the burden of defense to a defendant, connected with one or a few of so many distinct transactions, is vastly different not only in preparation for trial, but also in looking out for and securing safeguard against evidence affecting other defendants, to prevent its transference as "harmless error" or by psychological effect, in spite of instructions for keeping separate transactions separate.

328 U.S. at 766–67, 66 S.Ct. 1239.

This case is much closer to *Berger* than *Kotteakos.* Like *Berger,* there are only two conspiracies. Rather than 32 co-conspirators, there are nine, only two of whom were on trial. Lastly, unlike *Kotteakos,* where the different transactions were easily confused because of their number and

similarity,[5] the evidence here invited compartmentalization. Under these circumstances, we conclude that the evidentiary spillover from the joint trial of Duran and Mora was slight and did not substantially influence the verdict. Thus, we conclude that the variance was harmless.

Because the evidence at trial was sufficient to connect Mora to the New Mexico–Texas activities alleged in the indictment, and Duran to the California activities, and the variance between the indictment and the government's proof did not prejudice Duran and Mora's substantial rights, we reject their sufficiency claims.

### III

■ Duran and Roman argue that the district court erred in denying their motion to suppress evidence obtained from the wiretap of Montes's cell phone after January 27, 1997, the day that he purchased a new instrument. They argue that because neither the electronic serial number (ESN) on Montes's new cell phone, nor the phone number for that phone, was identified in the order authorizing the electronic surveillance, suppression of the conversations intercepted over that phone was required. We review the denial of a motion to suppress *de novo*. *See United States v. Scott,* 74 F.3d 175, 176 (9th Cir.1996).

The order authorizing the wiretap states that "[t]here is probable cause to believe that information concerning the above described offenses will be obtained through the continued interception of wire and electronic communications to and from ... cellular telephone number (213) 509–6367, electronic serial number 13805060251 ... ('Target Telephone # 7')." In addition, the order mandates that "the authorization apply to any changed telephone number assigned to a telephone with the same electronic serial number as Target Telephone # 7...." On January 22, 1997, Agent Sherman was informed by L.A. Cellular that the telephone number for Target

Telephone # 7 had been changed to (213) 280–2443, but that the ESN had not been changed. Pursuant to the terms of the wiretap order, agents continued to monitor Target Telephone # 7. On January 27, however, unbeknownst to the law enforcement officers monitoring the phone, Montes purchased a new cell phone with a different ESN. He deactivated his old cell phone and requested that telephone number (213) 280–2443, which he had obtained January 22, be assigned to his new cell phone. Consequently, the conversations intercepted on January 29 were made over a phone with telephone number (213) 280–2443, but a different ESN from that identified in the wiretap order.

On the basis of this chain of events, Duran and Roman filed a motion to suppress the wiretap evidence in the district court. They argued that the wiretap order did not authorize surveillance of Montes's new cell phone because it had a different ESN from that identified in the wiretap order. Thus, they asserted that surveillance of the new phone violated the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Street Act of 1968, 18 U.S.C. §§ 2510–2522, and that suppression of the January 29 conversations was required. They also argued that the evidence seized from the La Puente residence pursuant to a search warrant executed on the basis of the intercepted conversations had to be suppressed.

The district court conducted a hearing at which DEA Agent Sherman and Howard Chokan, an employee of L.A. Cellular, testified. Sherman testified that the officers' monitoring equipment, as well as the phone company's monitoring equipment, is dialed into the phone number and has nothing to do with the ESN. He explained that, as a consequence, neither the phone company nor the officers knew that the ESN had been changed. In fact, he first learned of the change in ESN in June

**5.** Each conspiracy in *Kotteakos* involved the placing of a false loan application through the same broker.

1997, when he was preparing for the hearing on the motion to suppress. Chokan confirmed that surveillance is keyed to the telephone number. He explained that the L.A. Cellular employees responsible for instituting wire taps do not monitor the ESN at all, but focus instead on the mobile number that they have been instructed to tap.

The district court denied the motion to suppress the wiretap evidence and the evidence obtained from the La Puente residence. First, it found that the order was not violated because "[t]he original number to any changed number, to any instrument, is capable of being traced back to the original number, and therefore, the chain remains intact.... The order is broad enough to cover changes in the telephone number, and changes in the instrument." Second, the court found that the officers intercepted the calls on the new cell phone in good faith. Duran and Roman challenge the district court's denial on the ground that the interception of the calls made on the new cell phone was not authorized by the wiretap order, and that the good faith exception does not apply under Title III.

An application for an order authorizing or approving the interception of a wire communication must include "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including ... a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted." 18 U.S.C. § 2518(1)(b)(ii).[6] Upon such an application, the judge may enter an ex parte order authorizing or approving the interception if the judge determines, among

other things, that "there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person." 18 U.S.C. § 2518(3)(d).[7] Such an order must specify "the nature and location of the communications facilities as to which, or the place where, authority to intercept is granted." 18 U.S.C. § 2518(4)(b).

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court ... if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515. Suppression is required:

(i) if the communication was unlawfully intercepted;

(ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or

(iii) the interception was not made in conformity with the order of authorization or approval.

18 U.S.C. § 2518(10)(a).

As an initial matter, Duran and Roman argue that the order's failure to identify the ESN on Montes's new cell phone resulted in a warrantless search. Secondly, they argue that the communications over his new cell phone were "unlawfully intercepted" and had to be suppressed. We disagree.

In *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967),

---

6. The application must also provide "details as to the particular offense that has been, is being, or is about to be committed," "a particular description of the type of communications sought to be intercepted," and "the identity of the person, if known, committing the offense and whose communications are to be intercepted." 18 U.S.C. § 2518(1)(b)(i), (iii), (iv).

7. This requirement, as well as the requirement that the applicant provide a particular description of the nature and location of the facilities from which the communication is to be intercepted, does not apply to roving wire taps. *See* 18 U.S.C. § 2518(11). However, the government did not seek a roving wire tap in this case.

the Supreme Court held that as long as the target has a reasonable expectation of privacy, a warrant is required before the government may electronically intercept his phone conversations. Because the officers in that case did not obtain a warrant, and none of the exceptions to the warrant requirement applied, the Court reversed the defendant's conviction. Unlike *Katz*, however, the officers in this case had a warrant to intercept conversations on Montes's cell phone. Therefore, *Katz* is inapposite. As the Supreme Court observed in a case where the government failed to identify every target of the wiretap,

> the omission on the part of law enforcement authorities was not a failure to seek prior judicial authorization, but a failure to identify every individual who could be expected to be overheard engaging in incriminating conversations. That the complete absence of prior judicial authorization would make an intercept unlawful has no bearing on the lawfulness of an intercept order that fails to identify every target.

*United States v. Donovan*, 429 U.S. 413, 436 n. 24, 97 S.Ct. 658, 50 L.Ed.2d 652 (1977). Because the officers here acted with prior judicial authorization, the January 29 interception was not a warrantless search requiring suppression under *Katz*.

██ Roman and Duran also argue that the January 29 communications were "unlawfully intercepted" because the order did not identify the ESN on Montes's new cell phone, and thus did not satisfy the particularization requirement of § 2518(4)(b). They argue that this was not a technical defect because it was equivalent to the failure to specify the address of a land-based phone. In their view, because the latter defect requires suppression, so too does the defect in this case.

██ The Supreme Court has explained that "suppression is not mandated for every violation of Title III, but only if 'disclosure' of the contents of intercepted communications, or derivative evidence, would be in violation of Title III." *United States*

*v. Chavez*, 416 U.S. 562, 575, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974). In particular, communications are only "unlawfully intercepted" and suppression mandated "where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." *United States v. Giordano*, 416 U.S. 505, 527, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). In *Giordano*, the Court held that the government's failure to obtain authorization for the wiretap application from one of the statutorily designated officials under 18 U.S.C. § 2516(1) required suppression of the evidence secured by the wire interceptions. "We are confident that the provision for pre-application approval was intended to play a central role in the statutory scheme and that suppression must follow when it is shown that this statutory requirement has been ignored." *Id.* at 528, 94 S.Ct. 1820.

In *Donovan*, however, the Court held that suppression was not required where the government's statutory violations consisted of a failure to include in its application "the identity of the person, if known, committing the offense and whose communications are to be intercepted," 18 U.S.C. § 2518(1)(b)(iv), and a failure to inform the issuing judge of the identities of persons whose conversations were intercepted so that he could decide whether they should be served with notice under 18 U.S.C. § 2518(8)(d). Distinguishing *Giordano*, the Court stated: "Here, however, the statutorily imposed preconditions to judicial authorization [under 18 U.S.C. § 2518(3) ] were satisfied, and the issuing judge was simply unaware that additional persons might be overheard engaging in incriminating conversations. In no meaningful sense can it be said that the presence of that information as to additional targets would have precluded judicial authorization of the intercept." *Donovan*, 429 U.S. at 436, 97 S.Ct. 658.

This case is controlled by *Donovan.* As was true in *Donovan,* the statutory preconditions to judicial authorization were satisfied in this case at the time the order issued, and the issuing judge was "simply unaware" that Montes might change cell phone devices. However, "[i]n no meaningful sense can it be said that the presence of that information as to additional [phones] would have precluded judicial authorization of the intercept." *Id.* To the contrary, the district judge indicated that he would have had no hesitation about issuing an order continuing the intercept had he known that the ESN had changed because, regardless of the ESN, the telephone number on the new cell phone was clearly linked to the original number in the order. The language of the order is to the same effect. By authorizing the continued interception of Target Telephone #7 even after the phone number changed, the issuing judge evidenced an intent to authorize interception of communications on any cell phone associated with the phone number identified in the order. The fact that the order only contemplated the possibility of changing telephone numbers, rather than changing ESNs, does not diminish the fact that he intended to, and on the basis of the government's application had the power to, authorize interception on any such cell phone during the period in question.

*United States v. Feldman,* 606 F.2d 673 (6th Cir.1979), is also analogous. In that case, the defendants argued that suppression of evidence derived from a wiretap of a "bootleg" phone was required because its phone number was not listed in the wiretap order.[8] The Sixth Circuit rejected the defendant's argument, noting that "the district court found the wiretap applications contained sufficient information to establish probable cause to wiretap any telephone located in the Bruno residence." *Id.* at 680. The fact that the order did not list "the *unknown* 'bootleg' telephone number in the authorization order [did not]

result[ ] in a failure to satisfy a statutory requirement which Congress implemented in order to insure electronic surveillance would only be used in situations 'clearly calling' for its use." *Id.* at 681 (footnote omitted). Indeed, "the wiretap authorization had as its clear purpose the authorization to tap all telephones in the Bruno home, and ... the addition or deletion of telephone numbers in the wiretap order had no constitutional or statutory significance." *Id.* at 680 (internal quotations omitted).

In this case, the wiretap application contained sufficient information to establish probable cause to wiretap any cell phone associated with the phone number identified in the order, and the order had as its "clear purpose" the authorization to tap all such phones. The order's failure to identify the proper ESN for the intercepted phone, like the order's failure to identify the telephone number of the bootleg phone in *Feldman,* did not result in a failure to ensure that the surveillance would only occur in situations "clearly calling" for its use. To the contrary, the essential requirement of § 2518 that "law enforcement authorities ... convince a District Court that probable cause existed to believe that a specific person was committing a specific offense using a specific telephone," *Donovan,* 429 U.S. at 437 n. 25, 97 S.Ct. 658, was met. The phone over which the interceptions occurred was connected to the phone identified in the order and there was no bad faith on the part of the intercepting officers. Under these circumstances, we conclude that the order's failure to identify the ESN on Montes's second cell phone was not fatal and suppression was not required. Thus, we hold that the district court properly denied Duran and Roman's motion to suppress the January 29 conversations and the evidence that was seized from the La Puente residence on the basis of them.

8. A "bootleg" phone is "an illegally installed extension connected to a telephone line not listed to the owner of the illegal extension." *Feldman,* 606 F.2d at 676 n. 6. The defen-

dants in *Feldman* used a neighboring line, which they brought into co-conspirator Bruno's home.

## IV

 Although the indictment against Rita Montes in this case was dismissed before trial, she indicated that she would assert her Fifth Amendment privilege if called to testify in Duran's case because of a pending federal narcotics case in Tennessee. Consequently, Duran's counsel asked the U.S. Attorney to grant use immunity to Rita.[9] By way of an offer of proof, Duran stated that Rita would testify that Duran was her boyfriend, that they had plans to go out to dinner on the night of the arrest, and that neither she nor Duran was involved in the drug transaction between Montes and Roman. The U.S. Attorney denied the request and Duran's counsel filed a motion to compel the government to grant Rita use immunity, which the district court denied.

Duran argues that the district court erred in denying his motion to compel the government to grant use immunity to Rita because the question of whether he resided at Rita's La Puente residence was "apparently an important one to the jury" and Rita could have testified that he did not live there. Moreover, he claims that the failure of the government to grant Rita use immunity had the effect of intentionally distorting the fact-finding process. In this vein, he argues that when the government suggested that Duran's explanation that he resided with his sister in Pomona was less credible because he did not call his sister as a defense witness to corroborate his account, it invited the jury to not only speculate as to why the appellant had not called his sister as a defense witness, but also to speculate as to why he had not called Rita Montes as a defense witness to testify that he did not live at the La Puente residence.

 "Immunity is an executive, not a judicial function, and '[t]his court has emphatically rejected the argument that the sixth amendment provides a defendant with a right to demand use immunity for defense witnesses who invoke their privilege against self-incrimination.'" *United States v. Baker,* 10 F.3d 1374, 1414 (9th Cir.1993) (quoting *United States v. Brutzman,* 731 F.2d 1449, 1451–52 (9th Cir. 1984)). An exception to this rule exists, however, where the prosecutor intentionally distorts the fact-finding process. *See id.* The fact-finding process is intentionally distorted where the prosecutor intentionally causes the witness to invoke the Fifth Amendment privilege, *see United States v. Montoya,* 945 F.2d 1068, 1078 (9th Cir.1991), or "grant[s] immunity to a witness in order to obtain his testimony, while denying immunity to a defense witness whose testimony would directly contradict that of the government witness." *United States v. Westerdahl,* 945 F.2d 1083, 1087 (9th Cir.1991).

Neither circumstance is present here. Rita decided to invoke the Fifth Amendment privilege at her attorney's urging, without any interference by the prosecutor. Moreover, the government did not grant use immunity to any witness whose testimony would have been contradicted by Rita's, nor did the prosecutor intentionally distort the fact-finding process by causing the jury to speculate as to why the defense had not called Rita to testify. The government made no reference to Duran's failure to call Rita as a witness. Rather, it properly argued that Duran's contention that he did not live at the La Puente residence was weakened by his failure to call his sister as a witness to corroborate his account that he lived with her in Pomona, by the DMV records listing the La Puente address as Duran's address, and by the evidence that he was at the house three

---

9. When a witness is granted use immunity, "the government may prosecute the witness for an offense related to the subject matter of the witness's testimony, [but] the testimony itself and any 'fruits' thereof may not be used against the witness in any criminal case ex- cept a prosecution for perjury arising out of the testimony." *United States v. Lord,* 711 F.2d 887, 890 (9th Cir.1983). The government's power to grant a witness use immunity is conferred by 18 U.S.C. §§ 6002–6003.

hours earlier than he claimed on direct examination.

In any event, the testimony that Duran claims would have strengthened his case-Rita's testimony that Duran did not live in the La Puente residence-was not made part of his offer of proof. Although Rita might have testified that Duran did not live in that residence, the district court had no assurance that she would do so. Thus, the district court did not err in refusing to compel the government to grant Rita use immunity.

## V

 Mora argues that Chu's testimony should have been suppressed because it was obtained by the government in violation of 18 U.S.C. § 201(c)(2).[10] The government violated the statute, he argues, by entering a plea agreement with Chu that authorized the government to request the court not to imprison Chu. Mora did not move to suppress or otherwise object to Chu's testimony at trial on the ground that it was unlawfully obtained by the government. Thus, our review is for plain error. *See United States v. Flores*, 172 F.3d 695, 699 (9th Cir.1999), *petition for cert. filed* (U.S. June 28, 1999) (No. 99–5111).

The district court did not plainly err in failing to suppress Chu's testimony. As was the case in *Flores*, "[a]t the time of the district court proceedings, no court had ever excluded evidence on the ground that the government violated section 201(c)(2)." *Id.* Moreover, all of the circuits to have considered the issue since Mora's trial have decided that § 201(c)(2) does not ap-

ply to the government's promises of leniency. *See id.* at 699–70.[11] Under these circumstances, there was no plain error in the district court's refusal to exclude Chu's testimony. *See United States v. Turman*, 122 F.3d 1167, 1170 (9th Cir.1997) ("Plain error, as we understand that term, is error that is so clear-cut, so obvious, a competent district judge should be able to avoid it without benefit of objection.").

## VI

 Finally, Roman argues that the trial court applied an incorrect legal standard in determining that he was not a minor participant under U.S.S.G. § 3B1.2 (1995).[12] Specifically, he contends that the district court erred because it failed to evaluate him in relation to the average participant in the single conspiracy alleged in the indictment. Roman argues that he was entitled to a minor role adjustment because most of the offense conduct did not involve him.

 The district court's interpretation of the Sentencing Guidelines is reviewed *de novo*. *See United States v. Newland*, 116 F.3d 400, 402 (9th Cir.1997). The court's determination that the defendant was not a minor participant in the offense is a factual determination reviewed for clear error. *See United States v. Pinkney*, 15 F.3d 825, 827 (9th Cir.1994).

The Guidelines define a "minor participant" as "any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment., n. 3.

---

**10.** 18 U.S.C. § 201(c)(2) states:
 Whoever-
 (2) directly or indirectly, gives, offers, or promises anything of value to any person, for or because of the testimony under oath or affirmation given or to be given by such person as a witness upon a trial ... before any court ...
 shall be fined under this title or imprisoned for not more than two years, or both.

**11.** Since *Flores* was decided, the Seventh Circuit has joined the Fifth, Sixth, Eighth, Tenth

Eleventh, and D.C. Circuits in deciding that § 201(c)(2) does not require the exclusion of evidence obtained by a promise of immunity. *See United States v. Condon,* 170 F.3d 687, 689 (7th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 1784, 143 L.Ed.2d 812 (1999).

**12.** Section 3B1.2 of the Sentencing Guidelines requires the district court to depart downward two levels if the defendant was a minor participant in the offense. *See* U.S.S.G. § 3B1.2(b).

 

We have interpreted this definition to mean that a minor role adjustment is warranted only if the defendant is "substantially" less culpable than his co-participants. *See United States v. Benitez,* 34 F.3d 1489, 1498 (9th Cir.1994). The decision whether to apply a minor role adjustment "involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, backg'd.

In this case, the probation officer compared Roman to his co-participants in the offense and concluded that although Roman did not exercise decision-making authority or control over his co-participants, he was not a minor participant because his participation in the offense "was integral to the successful completion of the drug transaction." The court agreed with this analysis, rejecting Roman's assertion that he was merely a "go-between" between the seller and Montes, and denying the minor role adjustment on the ground that "without Roman's participation, the [January 29] transaction would not have been concluded."

 We are not firmly convinced this is wrong. Focusing on the January 29 delivery of the seventeen kilograms of cocaine was not improper because, as the district court found, the delivery was Roman's only "relevant conduct." *See* U.S.S.G. § 1B1.3(a) (1995) (defining relevant conduct in conspiracy cases as "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" and stating that adjustments should be determined on the basis of the defendant's relevant conduct). In addition, the court did not clearly err in finding that Roman was not a minor participant in that transaction. Roman not only transported the drugs to Rita's home, but he also actively negotiated the sale with Montes. Furthermore, the amount of drugs involved in the transaction—17 kilograms-was substantial. In view of these circumstances, the district court properly concluded that Roman was not "substantially" less culpable than his co-participants and thus, that he was not entitled to a minor participant adjustment. *See United States v. Lui,* 941 F.2d 844, 849 (9th Cir.1991) (district court did not err in concluding that a defendant who possessed twelve kilograms of heroin was not a minor or minimal participant because he "failed to demonstrate that his role was purely that of a courier" and because "possession of a substantial amount of narcotics is grounds for refusing to grant a sentence reduction").

**AFFIRMED.**